JOEL M. CARLINS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Carlins v. Commissioner
Docket Nos. 5418-82; 5769-83; 5771-83; 5772-83; 5935-83; 6101-83; 6102-83; 6103-83.
United States Tax Court
T.C. Memo 1988-79; 1988 Tax Ct. Memo LEXIS 115; 55 T.C.M. (CCH) 228; T.C.M. (RIA) 88079; February 25, 1988; As amended February 29, 1988 Michael A. Moss and Steven B. Wolf, for the petitioner in docket No. 5418-82. Paul C. Arshonsky and Michael A. Sandberg, for the petitioners in docket Nos. 5769-83, 5771-83, 5772-83, 5935-83, 6101-83, 6102-83, and 6103-83. Judy Jacobs, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies, overpayments of tax, and additions to tax for petitioners in the following amounts: Deficiency
Addition to Tax
Petitioner
(Overpayment) [2]
Year
Sec. 6653(a) [3]
Joel M. Carlins
$  32,232 1978
--
Marvin Kamensky
and Judith N.
161,033 1978
$ 8,052
Kamensky
118,580 1979
5,929
Daniel B. Kamensky,
Minor, Marvin
(2,661)
1978
--
Kamensky,
14,453 1979
--
Guardian
(8,138)
1980
--
Robert N. Kamensky,
Minor, Marvin
(4,501)
1978
--
Kamensky,
14,282 1979
--
Guardian
(8,001)
1980
--
Todd L. Kamensky
(5,845)
1978
Minor, Marvin
14,513 1979
Kamensky, Guardian
(9,256)
1980
Henry S. Landan
and Joy M.
64,630 1978
3,232
Landan
59,003 1979
2,950
Andrew S. Landan,
Minor, Henry S.
(1,318)
1978
--
Landan,
431 1979
--
Guardian
(6,162)
1980
--
Jonathan B.
Landan, Minor,
( 1,318)
1978
--
Henry S. Landan,
431 1979
--
Guardian
( 6,162)
1980
--
*118 After concessions, [4] the primary issues for determination are (1) whether petitioners Marvin Kamensky, Henry Landan, and Joel Carlins realized ordinary income in 1978 as a result of the discharge of debt owed to Continental Illinois National Bank and Trust Company of Chicago, (2) whether the sales, cost of goods sold, and business deductions of Sinclair Galleries, Ltd., a small business corporation in which Marvin Kamensky and Henry Landan owned stock, should be adjusted in 1979 as determined by respondent, (3) whether petitioners Andrew and Jonathan Landan and Todd, Daniel, and Robert Kamensky were the recipients of income improperly assigned to them during the taxable years 1978 and 1979, and (4) whether petitioners Marvin and Judith Kamensky and Henry and Joy Landan are liable *119 for additions to tax under section 6653(a) for the taxable years 1978 and 1979 *120 For reasons of clarity and ease of discussion, the findings of fact and opinion tied to each of the above issues are presented separately. FINDINGS OF FACT - GENERAL Some of the facts have been stipulated and are found accordingly. The stipulation of facts, supplemental stipulations of facts, and attached exhibits are incorporated herein by this reference. Joel Carlins resided in Chicago, Illinois, when he filed his petition. Marvin and Judith Kamensky, husband and wife, resided in Northbrook, Illinois, when they filed their petition. Their children, Robert, Todd, and Daniel Kamensky, also resided in Northbrook, Illinois, when their petitions were filed. Henry and Joy Landan, husband and wife, resided in Chicago, Illinois, when they filed their petition. Their children, Andrew and Jonathan Landan, also resided in Chicago, Illinois, when their petitions were filed. All petitioners timely filed tax returns with the Internal Revenue Service Center in Kansas City, Missouri. Andrew and Jonathan Landan were born April 17, 1977. Robert Kamensky was born on October 2, 1969 and Daniel Kamensky was born on December 23, 1972. As such, they are minors. Todd Kamensky's birth *121 date is not revealed in the record. [5]
Petitioners Joel Carlins, Marvin Kamensky, and Henry Landan are all attorneys. Mr. Carlins was at one time a partner in a law firm in which Mr. Kamensky was a member. In 1977, Mr. Carlins ended his association with this firm. Mr. Kamensky became a certified public accountant in 1961 and received his law degree from DePaul University in 1966. Between 1961 and 1967, Mr. Kamensky worked for the Internal Revenue Service. Afterward, he entered the private practice of law, an occupation in which he has been involved for more than fifteen years. Mr. Landan received his law degree from DePaul University in 1969. He also received an LL.M. in taxation from New York University in 1970. In 1971, Mr. Landan joined the law firm of Carlins and Kamensky. He worked with Mr. Kamensky until April of 1984. Issue 1. Discharge of Debt
FINDINGS OF FACT In December of 1976, Marvin Kamensky, Joel Carlins, Henry Landan, and others incorporated Sagtat, Inc. (Sagtat), under Illinois law. [6] They formed the company, an electing small business *122 corporation, to exploit the business of developing and marketing computerized data processing systems. Marvin Kamensky acquired 433.33 shares of the company's $ 1 par value stock. He additionally held Sagtat's remaining 566.67 shares of such stock as nominee for the corporation's other shareholders. [7] These 1,000 shares represented the corporation's entire capital structure. *123 Prior to buying Sagtat's stock, Mr. Carlins did not particularly investigate the company and its contemplated deals. He instead noted the general nature of his investment and acted on the recommendation of Marvin Kamensky. At the time, however, Mr. Kamensky knew virtually nothing about the functioning of computers. In addition to purchasing the stock of Sagtat, Messrs. Carlins, Kamensky, and Landan loaned the fledgling company additional monies. [8] Neither notes nor other documentation memorializing these loans and their terms were introduced as evidence, however. *124 Joel Carlins loans Sagtat a total of $ 56,000. Of this total, $ 7,000 represented Mr. Carlins's own funds while $ 49,000 represented amounts he borrowed from Continental Illinois National Bank and Trust Company ("Continental Bank"). Marvin Kamensky loaned Sagtat $ 104,000 of which $ 13,000 represented his own funds and the remaining $ 91,000 represented funds he borrowed from Continental Bank. Finally, Henry Landan loaned Sagtat $ 40,000 -- $ 5,000 of his funds and $ 35,000 borrowed from Continental Bank. All the above-mentioned sums borrowed from Continental Bank were on a nonrecourse basis and were secured by the borrower's stock in Sagtat. Messrs. Landan and Kamensky never discussed what happened to the money they borrowed from Continental Bank and invested in Sagtat. On December 31, 1976, Sagtat entered into an agreement with Codon Corporation ("Codon"). Under the terms of this agreement ("the Codon Agreement"), Codon was to provide Sagtat with a time keeping, billing, and accounts receivable data processing system for medium size law firms. [9]Codon was to deliver the system on or before December 31, 1977. In return for this system, Codon was to receive $ 239,500. Upon *125 completion of the system, Codon also agreed to provide technical assistance and training to Sagtat's employees on the system's use. The assistance and training were to enable Sagtat's employees to successfully market the processing system. Codon was to receive $ 500 for providing this technical assistance and training. At the end of 1976, Codon was paid the total $ 240,000 in advance. *126 As of the end of 1977, the Codon agreement's termination date, Codon had not delivered the system to Sagtat. Nor did Codon deliver the system by the end of 1978, 1979, or 1980. In 1982, or 1982, a number of boxes of computer cards were delivered to Sagtat at the offices of the law firm of Kamensky and Landan. Not knowing what to do with the cards, Marvin Kamensky attempted to contact the people at Codon and Messrs. Pinsky and Wenz, individuals with whom he had dealt while negotiating the Codon agreement. His attempts, nevertheless, proved futile. He was unable to reach anyone at Codon; he had only sporadic communications with Robert Wenz; and his communications with Alex Pinsky resulted in no clear answers. During this period of time from the end of 1977 through 1982, and, indeed, through the date of the trial of this case, Messrs. Kamensky, Landan, and Carlins never sent or received any oral or written communications to or from Continental Bank, or any person acting or purporting to act on behalf of Continental Bank, concerning payment of the debt each owed to Continental Bank, concerning a release of these petitioners from liability under their respective loans, concerning *127 a transfer or release of the collateral securing each loan, or concerning any modification of each loan's terms. [10] At no time did these petitioners pay anything on their outstanding loans to Continental Bank or take any action to cause the collateral securing their debts to Continental Bank to be conveyed to the bank. Tied to their investments in Sagtat, Messrs. Carlins, Kamensky, and Landan received the following flow-through losses for the taxable years 1976 through 1980: Year
J. Carlins
M. Kamensky
H. Landan
1976 [11]
($ 55,999.64)
($ 104,000.00)
($ 40,001.12)
1977 [12]
(46.22)
(85.83)
(33.00)
1978 [13]
(24.00)
(44.50)
(17.00)
1979 [14]
(5.30)
(9.84)
(4.00)
1980 [15]
(6.69)
(12.43)
(5.00)
*128 In the notices of deficiency sent to Messrs. Carlins, Kamensky and Landan, respondent required each to recognize income in the following amounts in 1978 from the forgiveness of indebtedness: Joel Carlins
$  56,000
Marvin Kamensky
104,000
Henry Landan
40,001
OPINION The first issue we consider is whether petitioners Joel Carlins, Marvin Kamensky, and Henry Landan realized ordinary income in 1978 as a result of the discharge of a nonrecourse debt owed to Continental Bank. [16] We hold that this issue is governed by Cozzi v. Commissioner,88 T.C. 435 (1987), a case with facts analogous to those of the case before us. [17]
*129 The Cozzi taxpayers formed Hap Production Co. (Hap), a limited partnership for the stated purpose of providing services tied to the production of motion picture films. Later Hap entered into a nonrecourse loan agreement with Sargon Etablissement (Sargon), a Liechtenstein corporation. Under the agreement's terms, Hap promised to repay the loan's principal and interest according to a stated payment schedule ending in 1980. As security for the nonrecourse loan, Sargon retained a first position lien in all proceeds generated under the terms of a motion picture production agreement between Hap and Map Films, Ltd., a movie production company. Hap never paid Sargon any amounts in accordance with the loan agreement. Furthermore, Hap neither sent nor received any oral or written communication to or from Sargon concerning the loan's payment, concerning a release of Hap's liability under the loan agreement, concerning a transfer or release of the collateral securing the loan, or concerning any modification of the loan agreement. The Commissioner determined that, as a result of a release of Hap's debt to Sargon, the Cozzi taxpayers had ordinary income in 1980 in the amount of *130 their distributive share of this debt. [18] In supporting this determination, the Commissioner contended that the underlying security and sole source of loan payments to Sargon, the production agreement between Hap and Map, had become worthless and was abandoned by Hap in 1980. The Cozzi taxpayers recognized that Hap's abandonment of the security for the debt may result in income from the debt's discharge. They, nevertheless, contended that in 1980 nothing had happened, either overtly or impliedly, which indicated that Hap had abandoned the production agreement because of this securing asset's worthlessness. Cozzi v. Commissioner,88 T.C. at 446. We upheld the Commissioner's determination *131 that the Cozzi taxpayers had realized income in 1980 and noted the following general rules covering the discharge of a debt: The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged. The test for determining such moment requires a practical assessment of the facts and circumstances relating to the likelihood of payment. * * * Any "identifiable event" which fixes the loss with certainty may be taken into consideration. * * * [19] [Footnote added; citations omitted; Cozzi v. Commissioner,88 T.C. at 445.] The abandonment of a worthless collateral which represents a debt's sole payment source is an "identifiable event" which establishes the moment when the underlying debt is discharged. Cozzi v. Commissioner,88 T.C. at 445-447; see also Brountas v. Commissioner,74 T.C. 1062, 1074 (1980), supplemental opinion to 73 T.C. 491 (1979), *132 vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. in part on other grounds sub nom. CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982). To determine the moment when an abandonment of this collateral occurs, the Court must look to
"identifiable events" taken from the circumstances of the case. * * * An overt act may be sufficient to fix the time of the abandonment of an asset, but such an act is not required, and ultimately, it is the actions of the taxpayer in the context of the circumstances of a case which determine whether an abandonment has occurred. * * * [Additionally,] it will often be impossible to find one, and only one, event that clearly establishes the time of abandonment; there is likely to be a range of times, any one of which would be reasonable. [Citations omitted; Cozzi v. Commissioner,88 T.C. at 446-447.]
The taxpayer bears the burden of proving that the year determined by respondent is unreasonable. Cozzi v. Commissioner,88 T.C. at 440; Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Under the facts of this *133 case, respondent submits that 1978 was the proper year for Messrs. Carlins, Kamensky, and Landan to realize income from the discharge of their Continental Bank debts. To support this, respondent contends that the Sagtat stock represented the sole payment source of the nonrecourse debt each man owed Continental Bank and that this stock became worthless and was abandoned in 1978. We accept respondent's argument and both underlying contentions. That the Sagtat stock represented the sole payment source for each man's nonrecourse debt is clear. None of these three petitioners testified that he had ever paid any amount on his note's outstanding principal. [20] Moreover, on their returns for the taxable years in issue, these petitioners did not claim an interest deduction tied to interest paid to Continental Bank. This leads us to the conclusion that each of these petitioners paid no such interest. [21] Their failure to pay these interest liabilities lends support to the claim that these petitioners never intended Continental Bank to look to each of them as a payment source for the underlying nonrecourse liabilities. The unwillingness of each of these petitioners to be seen as an alternative *134 payment source supports our finding that the Sagtat stock represented the sole source of payment for each note these shares secured. The facts in the instant case that identify the worthlessness of the Sagtat stock similarly identify the time of this asset's abandonment. The guidelines for a determination of when stock becomes worthless are long established ones. [22] Of particular utility is Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940). There, we stated: The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed *135 its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. See also Steadman v. Commissioner,50 T.C. 369, 376-377 (1968), affd. 424 F.2d 1 (6th Cir. 1970). Applying the first of Morton's two-step test to the facts of the instant case, we find that between the years 1976 and *136 1980 the amount of Sagtat's liabilities greatly exceeded the value of its assets. [23] Thus, during 1978, the stock of Sagtat had no liquidating value whatsoever. We also find under Morton's second step that, as of the end of 1978, the stock of Sagtat had no potential value. The source of this stock's potential value rested solely on Sagtat's receiving the data processing system for which it had contracted and paid fully in advance. [24] However, Codon failed to deliver the system on or before *137 the initial delivery date of December 31, 1977. By the end of 1978, a full year after the contracted-for delivery date had passed, Sagtat had still not received the system. Of more importance during 1978, however, was the failure on the part of Sagtat's owners and officers to ardently demand delivery of the system or to seek damages from Codon for this latter company's failure to properly deliver the contracted-for product. [25] Except for the contrary, self-serving testimony of Messrs. Kamensky and Landan, the record is noticeably void of any evidence, written or otherwise, suggesting that Sagtat's officers and owners intended to truly enforce the rights of the corporation. [26]
*138 No evidence was produced showing that the terms of the Codon agreement were amended to grant Codon an extended date for delivery of the system. No oral testimony from a Codon representative or written evidence was presenting suggesting that representatives from Codon and Sagtat had met to discuss difficulties tied to the system's development. [27] Evidence in the form of minutes, correspondence, or other written documentation showing that the shareholders, board of directors, and officers of Sagtat had expressed concern over the system's nondelivery was not forthcoming. Petitioners Kamensky and *139 Landan point to a number of facts which they say demonstrate that the Sagtat stock retained a potential value in years after 1978. We, nevertheless, find these facts to be of little evidentiary value in convincing us to reject respondent's choice of 1978 as a reasonable year for income realization. First, the continued filing of tax returns for Sagtat in years subsequent to 1978 was an empty gesture on which we do not focus. Cf. Aldon Homes, Inc. v. Commissioner,33 T.C. 582, 600 (1959); Kimbrell v. Commissioner,371 F.2d 897, 901-902 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Steadman v. Commissioner,50 T.C. at 378. Second, the testimony of Messrs. Kamensky and Landan that in years after 1978 contracts were made with Messrs. Pinksy and Wenz concerning the system are uncorroborated, self-serving statements on which we need no rely. See Geigerv. Commissioner,440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; Sharwell v. Commissioner,419 F.2d 1057, 1060 (6th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Tokarski v. Commissioner,87 T.C. 74, 77 (1986). *140 Third, the failure of Continental Bank to demand payment on the nonrecourse liabilities in 1978, while of some evidentiary importance, does not convince us that respondent erred in choosing 1978 as the year of worthlessness and abandonment. We refuse to read into Continental Bank's inaction a finding that the Sagtat stock possessed potential value after 1978; this refusal is supported by our noting that there was no testimony from any Continental Bank representative who could explain this bank's inaction and valuation of the Sagtat stock. [28] Additionally, we find the inaction of Messrs. Kamensky, Landan, and Carlins, individuals who could easily and more readily ascertain and manipulate facts and circumstances tied to the stock's underlying worth, to be far more enlightening to our determination of the stock's 1978 value and abandonment than the inaction of a third-party creditor. Fourth, the fact that the Illinois Secretary of State dissolved Sagtat in 1983 does not require us to choose that year as the year of worthlessness and abandonment; "the occurrence *141 in a later year of an 'identifiable event' in the corporation's life, such as liquidation [, dissolution,] or receivership, [does] not, * * * determine the worthlessness of the stock, [where] 'its value had [already] become finally extinct.'" Morton v. Commissioner,38 B.T.A. at 1279. Fifth, the fact that Sagtat received boxes of computer cards in either 1981 or 1982 does not, in this instance, support an argument that the stock of the company retained any potential value after 1978. This statement rests once again on the half-hearted actions of Sagtat's controllers to enforce the corporation's rights under the Codon agreement. Codon's delivery of only the computer cards was clearly a breach of the Codon agreement. [29] However, these controllers took no meaningful action to recover a portion of the funds they had paid for the system or to force Codon to more fully perform in accord with its agreed-to obligations. From this half-hearted response, we can only surmise that Sagtat's controllers knew their venture had soured and, as a result, abandoned their stock in the company, because of worthlessness, in a year prior to 1981 or 1982. Because nothing was *142 done in 1978, the first year that an affirmative response was required, we conclude that that was the yearof worthlessness and abandonment. Messrs. Kamensky, Landan, and Carlins have failed to rebut the presumption of correctness which accompanies respondent's determination that income was realized in 1978. [30] See Welch v. Helvering,290 U.S. at 115; Steadman v. Commissioner,50 T.C. at 376; Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); Rule 142(a). These petitioners treated Sagtat as a burned out tax shelter. [31] They incurred nonrecourse debt solely for the purpose of generating significant tax benefits for themselves, and then attempted to let their corporation disappear without facing the tax consequences of their scheme. See Cozzi v. Commissioner,88 T.C. at 448. These petitioners, through their inaction in 1978, allowed their Sagtat stock to become worthless. Because of worthlessness, this stock was abandoned in 1978; and the nonrecourse debt which this stock secured *143 was, therefore, discharged. As a result of this discharge, these petitioners must recognize income for 1978 in amounts equal to those sums which they borrowed from Continental Bank on a nonrecourse basis and secured with their Sagtat stock. [32]
*144 Issue 2: Adjustments in the Income of Sinclair Galleries Ltd. for 1979 and 1980 FINDINGS OF FACT Sinclair Galleries is an electing small business corporation which kept its financial records according to the accrual method of accounting and which was formerly called Art Consultants, Ltd… Art Consultants, Ltd., was incorporated on November 18, 1977. Prior to that date, Art Consultants was a partnership. For the sake of simplicity, Sinclair Galleries, Ltd., and Art Consultants, Ltd., the corporation, will hereafter be referred to as "Sinclair." [33]Sinclair's business consisted of selling original graphics which are multiple artistic reproductions and include the subcategory of lithographs. Many of Sinclair's sales were to individuals on a bulk basis. Sinclair's purchasers received appraisals for the artwork they purchased from various third parties. *145 Sinclair did not have a warehouse for the storage of art. Most of the art sold by the company was "drop shipped," which means that the art was shipped directly from the publisher or distributor to the individual who purchased it from Sinclair. Prior to the publisher's shipment of the art to the individual purchaser, Sinclair did not own the art. Sinclair also did not have a gallery for the display of art. The company instead used space within the law offices of Kamensky and Landan for the storage of a few works of art and the maintenance of art files. Services rendered to Sinclair were provided by Messrs. Kamensky and Landan and others on the staff of the law firm. [34]
When a supplier to Sinclair shipped art to an individual purchaser, the shipment was documented by an invoice slip sent from the supplier to Sinclair. Sinclair paid the supplier the wholesale price *146 amount shown on the invoice. To evidence the sale to the purchaser, Sinclair sent a sales slip to the buyer, who paid the price reflected on this latter slip. On receiving the buyer's funds, Sinclair deposited the monies in an account at Harris Trust and Savings Bank ("Harris Bank"). Greenwich Art Consultants, Inc. ("Greenwich") was a joint venture between Sinclair and Preferred Partnerships, Inc. Greenwich was formed for the limited purpose of selling lithographs from the "Sound of Color" and the "Institution de L'Univers" editions by Leonardo Nierman. [35] When a supplier to Greenwich shipped art to a purchaser, the shipment was documented by an invoice slip sent from the supplier to Greenwich. [36] The purchaser paid Greenwich for the art received. Additionally, Greenwich received five checks totalling $ 31,200 from Sinclair; the checks were in the amounts of $ 700 (a check dated November 24, 1978), $ 700 (a check dated December 14, 1978), $ 14,400 ( a check dated January 10, 1979), $ 4,200 (a check dated January 10, 1979), and $ 11,200 (a check dated January 11, 1979). Greenwich filed no tax returns. *147 An understanding existed among the attorneys and other employees of the law firm of Kamensky and Landan that individuals working for the firm were to provide their services only to the firm. Additionally, Marvin Kamensky, Henry Landan, and three other attorneys of the firm, Michael Firsel, Michael Erens, and Sherwin Rubinstein, signed an agreement on June 8, 1979 ("June 8 Agreement"). [37] A clause in the preamble of the June 8 Agreement mentioned that "by reason of their partnership interest in Kamensky & Landan," Firsel, Erens, and Rubenstein were "to receive income interest in Sinclair Galleries, Ltd. of 7.875%, 9.000%, and 7.875% respectively * * * for the year 1979." [38] As of October 31, 1977 and in accord with a payout schedule prepared by Sinclair's accountant ("payout schedule"), Erens received $ 20,109.56 from the company, and Firsel and Rubinstein each received $ 16,894.58 from the company. [39] A report, entitled Analysis of Profit and Loss - vs - Cash Available and prepared by Sinclair's accountant for the company's taxable year ended October 31, 1979, showed the percentage of Sinclair's profits, based on the company's trial balance, that Erens, Firsel and Rubinstein *148 were to receive. On the same report, the total of these calculated profit amounts was later labelled a legal fee, payable to Kamensky and Landan. *149 For Sinclair's taxable year ended October 31, 1979, respondent decreased the company's cost of sales by $ 47,106, increased the company's sales income by $ 140,799 [40] and denied the company a $ 53,899 professional fee which covered a two and a half to three year period. [41] All three of these adjustments had the effect of increasing Sinclair's taxable income for that tax year. OPINION For Sinclair's taxable year ended October 31, 1979, respondent concedes that his $ 47,106 adjustment to the company's cost of sales was in error and that such cost figures was, therefore, correct as filed. Additionally, he concedes that his $ 98,274 increase in the company's accounts receivable for that taxable year was incorrect and that that year's adjusted sales figure consequently must be reduced by this conceded amount. Based on this *150 latter concession, the Court finds that the remaining $ 42,525 of respondent's initial $ 140,799 increase in Sinclair's sales for the company's taxable year ended in 1979 is still in dispute. [42] Of this $ 42,525 increase in sales, $ 41,668.30 is tied to an "exchange" account carried on Sinclair's books. [43]Sinclair's shareholders assert that this account's deposits were not taxable income to Sinclair but instead belonged to other entities, particularly Greenwich. [44] Respondent, on the other hand, contends that the amounts in the exchange account truly reflect sales income belonging to Sinclair. [45]
*151 The shareholding petitioners bear the burden of proving that respondent's presumptively correct deficiency notice is erroneous. Welch v. Helvering,290 U.S. at 115; Rule 142(a). A large portion of this disputed exchange account reflects income items transferred from one entity to another, closely-related entity. Because of the affinity shared between Sinclair and Greenwich, we must carefully scrutinize the disputed account and transfers to and from it. Cf. Baumer v. United States,580 F.2d 863, 877 (5th Cir., 1978); United States v. Pomponio,563 F.2d 659, 663 (4th Cir. 1977). In brief, Sinclair's shareholders attempt to explain and trace the movement of $ 31,200 into their company's exchange account and this amount's eventual transfer out of the account and into Greenwich's bank account. [46] They point out that invoices from suppliers to Greenwich clearly show that sales were made by Greenwich to certain purchasers. They then suggest that Sinclair's bank deposit slips reveal that Sinclair deposited into its account at Harris Bank amounts paid by these certain purchasers from Greenwich. Finally, they produced five cancelled *152 checks totalling $ 31,200 payable to Greenwich and drawing on Sinclair's checking account at Harris Bank. This chain from invoice slips to cancelled checks, these petitioners argue, clearly reveals that at least $ 31,200 of the exchange account's $ 41,668.30 total credits represents income properly chargeable to Greenwich and not to Sinclair. Petitioners submit that the foregoing transactions supports a finding that $ 31,200 of the exchange account's amount reflects income of Greenwich and not of Sinclair. However, we find under close scrutiny that these petitioners have failed to present us with the substantive foundation necessary to uphold their position. In this respect, we observe that invoices from Greenwich's suppliers provide only those supplier's prices for the listed items; Greenwich's customer *153 price list for the particular period was never presented as evidence. We, thus, are unable to translate an amount appearing on the supplier's invoice into an actual amount paid by Greenwich's customers. [47] Further, our examination of invoices from Sinclair's suppliers reveals that customers of Greenwich were also customers of Sinclair. The conclusion we draw from this latter revelation is that amounts appearing on the deposit slips of Sinclair and tied to a particular purchaser from both Greenwich and Sinclair may in fact reflect this purchaser's payment of his obligation to Sinclair and not to Greenwich. [48] Our inability to determine whether Sinclair's deposit slip amounts represent payments to Sinclair or Greenwich is compounded by the fact that neither Sinclair's customer price list for the particular period nor the deposit slips to Greenwich's bank account are in evidence. *154 A more fully developed record would have eased our endeavors to determine the true income recipient of the questioned amounts in the exchange account. Lacking a record containing the necessary information, however, we simply cannot accept Sinclair's five check payments, or any amount in the exchange account, as amounts embodying income earned by an entity other than Sinclair. Our inability to allocate and determine is buttressed by our observance that a likelihood existed for a veiled attempt to shift income from one entity, Sinclair, to its closely-related other, Greenwich. This likelihood is heightened by the fact that Greenwich filed no tax returns. Petitioners' failure fully to document and justify the movement of sums into and out of the exchange account impels us to conclude that they have neither rebuffed the inference of income shifting nor successfully carried their burden of proof. Welch v. Helvering,290 U.S. at 115; Rule 142(a). Consequently, we find that the exchange account's full amount represents income earned by Sinclair. Having discussed respondent's adjustments to Sinclair's sales and cost of sales for the company's taxable year ended *155 in 1979, we now examine his disallowance of a $ 53,899 professional fee claimed by the company in that same year. This $ 53,899 professional fee is part of a larger, $ 54,699 professional fee claimed by Sinclair in that same tax year. In his notices of deficiency sent to Sinclair's shareholders, respondent accepted the difference between these two amounts as being a properly deductible professional fee. Petitioner Kamensky testified that the $ 53,899 professional fee paid by Sinclair represented a payment by the company for rent covering a two and a half to three year period and for substantial services rendered to it over this same time frame by Messers. Kamensky and Landan, other attorneys in the firm of Kamensky and Landan, and the firm's clerical staff. In support of this testimony, Kamensky produced time sheets from the law firm showing that he and Mr. Landan had compiled a substantial number of hours in the service of Sinclair and other art ventures over a period from late 1977 through October of 1978. Respondent argued that this $ 53,899 amount claimed by Sinclair was not a professional fee but instead represented amounts paid to Erens, Firsel, and Rubinstein as their *156 interest in the company's income as mentioned in the June 8 Agreement's preambulatory language. In support of this argument, respondent pointed to Sinclair's payout schedule. In upholding respondent's claim that the disputed $ 53,899 does not represent a properly deductible professional fee, we note that the preambulatory language of the June 8 Agreement is quite explicit in its statement that, by reason of their partnership interest in the law firm of Kamensky and Landan, Erens, Firsel, and Rubinstein were entitled to an income interest in Sinclair. [49] Additionally, the payout schedule shows that sums were distributed to these three individuals during 1979. However, Sinclair's books and records, appropriate tax return, and this return's attachments reveal that these income payouts were not accounted for as shares of Sinclair's undistributed taxable income. We can only surmise, therefore, that Sinclair attempted to account for the income payouts to these three individuals by labelling the payouts "professional fees." [50] To support this labelling, however, Sinclair's shareholders have produced no corroborating evidence that any of these three individuals ever performed services *157 for Sinclair. Without producing such corroboration, these petitioning shareholders have not successfully borne their burden of proof. [51] See Welch v. Helvering,290 U.S. at 115; Rule 142(a). We, accordingly, deny Sinclair's claim of a professional fee for the company's taxable year ended October 31, 1979, to the extent of $ 53,899. [52]
*158 Issue 3. Diversion of Income
FINDINGS OF FACT For its taxable years ending in its shareholders' 1978 and 1979 taxable years, Sinclair listed on its Statements for Recipients of Miscellaneous Income, Form 1099-MISC, as commissions and fees paid to nonemployees the following amounts: Sinclair's Taxable Year Ending
in the Following Calendar Year
Recipient
1978
1979
Marvin Kamensky
$ 22,113
$ 28,793
Daniel Kamensky
16,562
21,569
Robert Kamensky
16,562
21,569
Todd Kamensky
16,653
21,681
Henry Landan
4,550
11,849
Andrew Landan
7,280
14,135
Jonathan Landan
7,280
14,133
Donna Barrett
500
1,000
Professional
-
3,668
Consultants Inc.
Roger Mandel
-
500
On its appropriate small business corporation income tax return, Form 1120S, Sinclair reflected the sums of these commission amounts in deductions it subtracted from its total income to derive taxable income. [53]
During these two taxable *159 years, Sinclair allocated to each of its stockholders the following amounts of its undistributed taxable income: Sinclair's Taxable Year Ending
in Following Calendar Year
Stockholder
1978 [54]
1979
Marvin Kamensky
1,798
12,124
Daniel Kamensky
1,347
9,083
Robert Kamensky
1,347
9,083
Todd Kamensky
1,354
9,129
Henry Landan
152
4,989
Andrew Landan
243
5,952
Jonathan Landan
243
5,952
Sinclair's shareholders claimed the following Schedule E and additional income amounts [55] as being received from the company during the calendar taxable years 1978 and 1979: Schedule E Income
Kamensky
Landan
Shareholder
Marvin
Daniel
Robert
Todd
Henry
Andrew
Jonathan
Year
1978
$ 1,798
$ 1,347
$ 1,347
$ 1,354
$ 152
$ 253
$ 243
1979
$ 12,124
$ 9,083
$ 9,083
$ 9,129
$ 4,989
$ 5,952
$ 5,952
Additional Income [56]
1978
$ 22,113
$ 16,562
$ 16,562
$ 16,653
$ 4,550
$ 7,280
$ 7,280
1979
$ 28,793
$ 21,569
$ 21,569
$ 21,681
$ 11,849
$ 14,133
$ 14,133
*160 On their tax returns for 1978 and 1979, petitioners Andrew and Jonathan Landan labelled the additional income amounts they received from Sinclair "commissions." Additionally, these two petitioners included these amounts as "commissions" *161 in their calculation of self-employment tax for each of the three years. On his tax returns for 1978 and 1979, petitioner Henry Landan labelled the additional income received from Sinclair as either "commission" or "fees." [57]
On their respective individual Federal income tax returns, petitioners Marvin, Daniel, Robert, and Todd Kamensky did not label any of the additional amounts received from Sinclair as "commissions." In referring to these amounts, these petitioners instead either mentioned Sinclair as the source of the income or referenced Sinclair's 1099-MISCC forms. Petitioners Daniel, Robert, and Todd Kamensky did not file self-employment tax returns for the years 1978 and 1979. Petitioner Marvin Kamensky did file self-employment tax returns in 1978 and 1979; however, on neither of these returns did he specifically list the additional amounts received from Sinclair as "commission" income. Marvin Kamensky also filed a Form 4726, Maximum Tax on Personal Service Income, for each of the years 1978 and 1979. On these *162 forms, he listed the additional income he received from Sinclair as personal service income. None of these petitioners had their returns prepared by a paid preparer. Henry Landan and his wife, Joy Landan, signed their joint tax returns for 1978 and 1979. Additionally, Joy Landan signed the 1978 and 1979 returns of this couple's two children, Jonathan and Andrew. Marvin and Judy Kamensky signed their joint returns for 1978 and 1979. The returns of Todd, Daniel, and Robert Kamensky, their children, were either unsigned or signed by Marvin Kamensky. Although petitioner Todd Kamensky performed only minor services for Sinclair, the other four children, Robert and Daniel Kamensky and Jonathan and Andrew Landan, performed no services for the company during the years 1978 and 1979. Alternatively, over this same two-year period, petitioners Marvin Kamensky and Henry Landan performed substantial services for Sinclair. In his notices of deficiency to petitioners Todd, Daniel, and Robert Kamensky and to petitioners Andrew and Todd Landan, respondent determined that the commission income reported by the taxpayers was not earned by them and that these taxpayers had been assigned their *163 reported income for the sole purpose of the assignor's avoiding the payment of taxes. Having made this determination, he reduced each of these five petitioners additional income received from Sinclair in years 1978 and 1979 to zero. In conjunction with these reductions, respondent increased Henry Landan's additional income received from Sinclair by $ 14,560.00 in 1978 and by $ 28,266.00 in 1979, [58] and increased Marvin Kamensky's additional income received from Sinclair by $ 49,777.00 in 1978 and by $ 64,819.00 in 1979. In their petitions filed with this Court, petitioners *164 Todd, Daniel, and Robert Kamensky and petitioners Andrew and Jonathan Landan pled that "During the calendar years 1978, 1979, and 1980 [Sinclair] determined that the shareholders should receive commissions. The corporation distributed the commissions based upon the ownership percentage of the shareholders." They continued on to assert that "the commission[s] [they] received [were] earned * * *" and asked this Court to so find. In their petitions filed with this Court, petitioners Harry Landan and Marvin Kamensky described the additional income received from Sinclair as "commissions." OPINION In attacking respondent's claim that the amounts of additional income paid by Sinclair to the children of Marvin Kamensky and Henry Landan were not income amounts taxable to these two parents, the shareholders of Sinclair argued in their brief that these additional amounts did not in the least represent commissions paid by Sinclair. They instead contended that these amounts represented further divisions of the company's undistributed taxable income for the tax years involved. Having contended such, they noted that respondent did not challenge the bona fides of the Landan and Kamensky *165 children's stock ownership in Sinclair and, therefore, concluded that, as a further division of the company's undistributed taxable income, this additional income paid the children should remain the income of the children. We, however, reject the conclusion of these petitioners. We find that the additional amounts do in fact represent a payment for services rendered to Sinclair and consequently hold that those additional amounts paid the Kamensky and Landan children are in actuality amounts of reported income which had been erroneously assigned to these children by their respective fathers. We premise our holding that the children's additional Sinclair income is actually income of their respective fathers on the well-grounded principle that a taxpayer who assigns or transfers compensation for personal services to another individual fails to be relieved of Federal income tax liability, regardless of the motivation behind the transfer. See Lucas v. Earl,281 U.S. 111 (1930); Helvering v. Horst,311 U.S. 112 (1940); Helvering v. Eubank,311 U.S. 122 (1940). We first focus on our finding that the additional amounts paid by Sinclair *166 in fact represent commission payments for services rendered the company. In doing so, we look to the substance underlying Sinclair's payment of these additional amounts. This substance is best revealed through an examination of Sinclair's claimed deductions for the taxable year ended October 31, 1979. In that year, Sinclair claimed a $ 54,699 professional fee to the firm of Kamensky and Landan. [59] We have, however, found that the payment of $ 53,899 of this professional fee did not include an amount for the substantial services provided to Sinclair. The payment was actually a payment of the company's income to Erens, Firsel, and Rubinstein. Accepting this finding, we conclude that, in substance, the commissions paid by Sinclair are that company's payments for the substantial services rendered in its behalf. *167 The intent of Sinclair and its shareholders, as expressed through their actions, also comports with this substance. [60] We begin by pointing out that Messrs. Kamensky and Landan and their children each alleged in the petition each filed that the amounts were "commissions." On their tax returns, the Landans labelled their received additional amounts "commissions" and, for the most part, reflected these commission amounts in their calculations of self-employment tax. Marvin Kamensky labelled his received commission income as personal service income on his Forms 4726. [61] Though his children did not specifically refer to the additional amounts they received from Sinclair as "commissions," they, at times, referenced Sinclair's Forms 1099-MISC which did label the amounts "commissions." Finally, Sinclair itself treated these additional amounts it paid its shareholders as if these amounts were payments for services performed on its behalf. [62]
*168 Having decided that the "commissions" are payments for services provided Sinclair, we next determine whether those commissions paid the children of Marvin Kamensky and Henry Landan are taxable to the children. In 1978 and 1979, Sinclair fully valued the services provided it and claimed appropriate deductions. [63] In valuing these services, the company attributed an amount in each year to the total services provided by the Kamenskys and the total services provided by the Landans. However, the facts bear out that among the Kamenskys and the Landans only the fathers performed substantial services for Sinclair which would justify the company's payment of these yearly total amounts. [64] With this information before us, we find that these commissions paid the Kamensky and Landan children in fact represent amounts taxable to these children's respective fathers. [65]
*169 In their briefs, these shareholding petitioners argued that the children's commissions should not be included in the income of the fathers because this inclusion would result in Sinclair's paying the two gentlemen amounts which were unreasonable. [66] We reject this argument. There are not sufficient facts in the record to support such a contention. [67] Furthermore, the reasonableness of the commissions tagged to the fathers was not raised as an issue; hence their reasonableness is conceded. [68] Rule 34(b)(4). *170 Issue 4. Addition to Tax - Section 6653(a) [69]
*171 FINDINGS OF FACT AND OPINION Petitioners Marvin Kamensky and Henry Landan were actively involved in the management and day-to-day operations of Sinclair. Both were also attorneys. Each of their past experiences reveals that they both possessed a thorough, working knowledge of the tax law. [70] Respondent determined that, pursuant to section 6653(a), both petitioners are liable for the following additions to tax for 1978 and 1979: Addition to Tax
Petitioner
Tax
Sec. 6653(a)
Marvin Kamensky
1978
$ 8,092
1979
5,929
Henry Landan
1978
$ 3,232
1979
2,950
Section 6653(a) provides for additions to tax if any part of the underpayment is due to negligence of intentional disregard of rules or regulations. Under section 6653(a), negligence is a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners Kamensky and Landan argue on brief that, because the deficiencies *172 tied to their dockets involve adjustments and issues of a highly technical and complex nature in which honest differences of opinion can exist, the addition for negligence must not be sustained. As their authority, they cite Marcello v. Commissioner,43 T.C. 168 (1964), affd. on this issue and remanded on another issue 380 F.2d 499 (5th Cir. 1967). In Marcello we, nevertheless, held that the addition to tax for negligence was properly determined even though that case involved "a rather complex legal determination." Marcello v. Commissioner,43 T.C. at 182. We reached this result on the grounds that the Marcello taxpayer had been negligent in his failure to maintain expense records. Having found this ground, we further stated, "Inasmuch as part of the underpayment of tax is due to negligence, the addition to tax under section 6653(a) must be imposed on the entire amount of such underpayment." Marcello v. Commissioner,43 T.C. at 182. In this case we likewise find that though complex issues are present, Marvin Kamensky and Henry Landan, nevertheless, have been negligent. Their negligence is most apparent in *173 the manner with which they allowed their commission income to be assigned to children who performed either minor or no services for Sinclair and allowed the profit distributions to Erens, Firsel, and Rubinstein to be reported by Sinclair as "professional fees." These two men may not fall back on an excuse that the misassigning and misreporting of income was the fault of Sinclair's accountant. Both men were actively involved in the operations of Sinclair; and, more importantly, both men were knowledgeable tax lawyers. Therefore, inasmuch as part of the underpayment of tax is due to negligence, the additions to tax under section 6653(a) are sustained. In sum, we believe it is appropriate to relate what became obvious to us during the course of the trial and upon review of the record in the process of our writing our factual findings and opinion. We found the documentation of Sagtat issues was slim from the least demanding point of view. In effect, there was no substantive evidence of the "loans" from Continental Bank to the Sagtat shareholders, and there was no indication that Sagtat actually engaged in business activity. We have seen mostly facades which were constructed by knowledgeable *174 tax lawyers and which provided obstructions and stumbling blocks to our findings. We opine that these tax lawyers were the architects of obfuscating tactics which produced a trail of examination barriers that inhibited a clear view by us of the transactions. In this respect, we are impelled to state that the testimony of petitioner Marvin Kamensky, a former IRS agent and a lawyer-CPA, was equivocal and vague; and we, consequently, afforded it little substantive weight. Window dressing is one thing -- but the obfuscation and obscurantism we have viewed and heard in this case goes beyond that. The unresolved mysteries and lack of substance in the record before us confirm our conclusion. Finally, were it not for concessions made by respondent at trial and on brief, we would further conclude that the trial of this case was mostly a dilatory tactic by petitioners to delay their day of reckoning with the tax collector. Decision will be entered under Rule 155 in docket Nos. 5418-82; 5769-83; 5771-83; 6101-83; 6102-83; and 6103-83.
An appropriate order will be issued in docket Nos. 5772-83 and 5935-83.
[71]
*175 Footnotes
1. The following cases were consolidated: Jonathan B. Landan, docket No. 5769-83; Andrew S. Landan, docket No. 5771-83; Marvin Kamensky and Judith N. Kamensky, docket No. 5772-83; Henry S. Landan and Joy M. Landan, docket No. 5935-83; Todd L. Kamensky, docket No. 6101-83; Robert N. Kamensky, docket No. 6102-83; and Daniel B. Kamensky, docket No. 6103-83. ↩
2. With respect to the children's overpayments in 1978 and 1980, this Court has no jurisdiction because no deficiencies have been determined against these taxpayers for these two taxable years. ↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. The parties have settled the Westpark Associates adjustment by allowing Marvin and Judith Kamensky to deduct $ 10,675 of the $ 80,069 claimed on their 1978 return and by allowing Henry and Joy Landan to deduct $ 7,382 of $ 55,958 claimed on their 1978 return. The parties have also settled the Treasury bill straddle loss issue which affected Henry and Joy Landan's and Marvin and Judith Kamensky's 1979 tax years. Henry and Joy Landan concede that their allocable share of loss is $ 50,449.75 and not $ 67,603 as reflected in respondent's notice of deficiency. Henry and Joy Landan have agreed that the $ 50,449.75 loss in question is not allowable. Marvin and Judith Kamensky concede that their allocable share of loss is $ 84,756.25 and $ 67,603 as reflected in respondent's notice of deficiency. Marvin and Judith Kamensky have agreed that the $ 84,756.25 loss in question is not allowable and that their taxable income should be increased in that amount. At the trial the Court decided that Marvin and Judith Kamensky did not receive $ 192 of the $ 618 of interest income in 1978 as determined in the notice of deficiency. The Court also decided that Marvin and Judith Kamensky did not receive $ 1,215 of the $ 1,308 of dividend income in 1978 determined in the notice of deficiency. On December 26, 1984, this Court granted respondent's motion to sever the lithograph contribution issue for Marvin and Judith Kamensky and Henry and Joy Landan. The issue was to be held in abeyance pending this Court's opinion in Lio v. Commissioner, docket No. 29514-81, and Orth v. Commissioner, docket No. 13143-82. Our opinion in these two cases appears at 85 T.C. 56 (1985), affd. 813 F.2d 837↩ (7th Cir. 1987). 5. In the motion to consolidate, Todd Kamensky, petitioner in docket No. 6101-83, is listed as a minor. ↩
6. On its tax returns for the calendar taxable years 1976 through 1980, Sagtat listed as a return address the same address used by the law firm of Kamensky and Landan. On December 1, 19883, the Secretary of State of Illinois dissolved the company for failure to file an annual report and pay an annual franchise fee. At the time of Sagtat's dissolution, its checking account at Harris Trust and Savings Bank reflected the following transactions: ↩
Date Transaction
Processed
Transaction
Balance
December 31, 1976
Balance brought forward
$ 100.00
January 4, 1977
$ 110.01 deposit
210.01
January 25, 1977
$ 110.00 deposit
320.01
February 23, 1977
$ 9.47 payment - fee to print
310.54
checks
March 7, 1977
$ 54.90 deposit
365.44
April 28, 1977
$ 253.47 check to Carlins & Kamensky
111.97
September 15, 1977
$ 26.00 check to Secretary
of State of Illinois
85.97
March 29, 1978
$ 15.00 check to Secretary
of State of Illinois
70.97
April 24, 1978
$ 40.00 check to Anthony Poulos,
CPA, for 1977 tax return
30.97
July 3, 1978
$ 25.00 check to Secretary
of State of Illinois
5.97
March 13, 1980
$ 5.97 check to Kamensky & L
0   March 14, 1980
Closed
7. As nominee, Marvin Kamensky held the following share amounts for the following shareholders: ↩
Shareholder
Number of Shares
Joel Carlins
233.33
Henry Landan
166.67
Melvin Zahn
66.67
Paul Kamensky
66.67
Howard Ecker
33.33
566.67
8. Under the terms of an unexecuted agreement, dated December 30, 1976, the shareholders of Sagtat agreed to loan the company the following amounts: Shareholder
Loan to Corporation
Marvin Kamensky
$ 103,566.67
Joel Carlins
55,766.67
Henry Landan
39,833.33
Melvyn Zahn
15,933.33
Paul Kamensky
15,933.33
Howard Ecker
7,966.67
$ 239,000.00
In loaning these amounts to Sagtat, each shareholder was to borrow certain sums on a nonrecourse basis from Continental Illinois National Bank and Trust Company of Chicago ("Continental Bank"). Under the agreement's terms, the shareholders were to turnover their Sagtat shares to Continental Bank as collateral for their borrowed sums. The amounts each shareholder was to borrow from Continental Bank are as follows: Borrowings from
Shareholder
Continental
Marvin Kamensky
$  91,000
Joel Carlins
49,000
Henry Landan
35,000
Melvyn Zahn
14,000
Paul Kamensky
14,000
Howard Ecker
7,000
$ 210,000
Though the respective nonrecourse notes to Continental Bank of Messrs. Carlins, Kamensky, and Landan were never produced as evidence, an unexecuted note in the amount of $ 210,000 and payable to Continental Bank was introduced. Under the terms of this unexecuted nonrecourse note, the note's maker was to pay the note's principal sum on or before January 31, 1982. Additionally, interest on the unpaid principal amount payable at the rate of 8 percent per annum was due on January 31 of each year until the principal's full payment. In the case of at least a 10-day default on the maker's payment of principal or of interest, the entire unpaid principal sum of the note and any accrued interest would become due and payable on demand. The pledged security for this note was the common stock of Sagtat, Inc. ↩
9. Under the terms of the agreement, Codon specifically was to provide the following documentation: (a) Executive systems flow, (b) Operational flow chart, (c) Procedural write-ups, (d) File definitions, (e) Record layouts, (f) Report layouts, (g) Program flow charts, (h) Program coding, (i) Program test data, (j) Systems test data, and (k) Market test data. In addition to this first agreement, Sagtat and Codon entered into a license agreement dated December 31, 1976. Under this agreement, Sagtat granted Codon a license through 1981 to market and use the data processing system for which Codon agreed to pay license fees. Both agreements were signed by Marvin Kamensky as president of Sagtat and by Donald Bauer as vice president of Codon. Petitioners Marvin Kamensky, Joel Carlins, and Henry Landan never met Donald Bauer during the agreements' negotiation or any time thereafter. In negotiating the Codon agreements, Marvin Kamensky dealt with two individuals, Alex Pinsky and Robert Wenz. However, nowhere in the record is there evidence defining the exact relationship that either Alex Pinsky or Robert Wenz had with Codon. ↩
10. The Court additionally notes that on the stipulated tax returns for Messrs. Kamensky (taxable years 1976 through 1979), Landan (taxable years 1977 through 1980), and Carlins (taxable years 1976 and 1978), no amounts were claimed as deductions for interest paid to Continental Bank. ↩
11. Sagtat used the calendar year as its tax year. Sagtat's 1976 return (Form 1120-S) reflects the following taxable loss: Income
$        0    Amortization
(1.89)
Research and development costs
(239,500.00)
Employee training
(500.00)
Taxable (loss)
$ (240,001.89)
The taxable loss was allocated pro rata among the shareholders. Additionally, this return reflects the following balance sheet as of Dec. 31, 1976: Balance Sheet
Assets
Cash
$ 320.01
Intangible assets
$ 113.57 Less: accum. amort.
(1.89)
111.68
$ 431.69
↩
Liabilities & Shareholder's Equity
Loan from shareholders
$  239,433.58 Capital stock
1,000.00 Shareholders UTI previously taxed
(240,001.89)
$      431.69 12. Sagtat's 1977 return reflects the following taxable loss and balance sheet as of Dec. 31, 1977: Income
$    -    Franchise tax
(26.00 Amortization
(22.71)
Annual report
(15.00)
Misc. expense
(124.90)
Bank charges
(9.47)
Taxable (loss)
$ (198.08)
Balance Sheet
Assets
Cash
$  85.97
Intangible assets
$ 113.57 Less: accum. amort.
(24.60)
88.97
$ 174.94
↩
Liabilities & Shareholder's Equity
Loan from shareholders
$  239,374.91 Capital stock
1,000.00 Shareholders UTI previously taxed
(240,199.97)
$      174.94 13. Sagtat's 1978 return reflects the following loss as of Dec. 31, 1978: Income
$    0    Franchise tax
(25.00)
Amortization
(22.71)
Annual report
(15.00)
Professional Fee
(40.00)
Taxable (loss)
$ (102.71)
Sagtat's 1979 return reflects the following balance sheet as of the start of the 1979 taxable year: Balance Sheet
Assets
Cash
$  5.97
Intangible assets
$  113.57 Less: accum. amort.
( 47.31)
66.26
$ 72.23
↩
Liabilities & Shareholder's Equity
Loan from shareholders
$  239,374.91 Capital stock
1,000.00 Shareholders UTI previously taxed
(240,302.68)
$       72.23 14. Sagtat's 1979 return reflects the following loss and year-end balance sheet: Income
$   0
Amortization
(22.71)
Taxable (loss)
$ (22.71)
Balance Sheet
Assets
Cash
$  5.97
Intangible assets
$ 113.57 Less: accum. amort.
(70.02)
43.55
$ 49.52
↩
Liabilities & Shareholder's Equity
Loan from shareholders
$  239,374.91 Capital stock
1,000.00 Shareholders UTI previously taxed
(240,325.39)
$       49.52 15. Sagtat's 1980 return reflects the following loss and year-end balance sheet: Income
$   0    Franchise tax
(5.97)
Amortization
(22.71)
Taxable (loss)
$ (28.68)
Balance Sheet
Assets
Cash
$ 0    Intangible assets
$ 113.57 Less: accum. amort.
(92.73)
20.84
$ 20.84
↩
Liabilities & Shareholder's Equity
Loan from shareholders
$ 239,374.91 Capital stock
1,000.00 Shareholders UTI previously taxed
(240,354.07)
$       20.84 16. On brief, petitioners Kamensky, Landan and Carlins do not dispute the fact that they realized income from the discharge of indebtedness. Nor do these petitioners question that the character of this realized income is ordinary. These petitioners instead argue that respondent erred in requiring them to recognize the income in 1978.↩
17. Moreover, Commissioner v. Tufts,461 U.S. 300 (1983), guides our consideration of this first issue. In Tufts, the Supreme Court stated "Crane [v. Commissioner,331 U.S. 1 (1947)] also stands for the broader proposition, however, that a nonrecourse loan should be treated as a true loan. We therefore hold that a taxpayer must account for the proceeds of obligations he has received tax-free and included in basis." Commissioner v. Tufts,461 U.S. at 313↩. 18. In Cozzi, the Commissioner initially advanced "three arguments in support of his determination: Hap's debt to Sargon was discharged or satisfied by a third party, Hap abandoned its interest in the production agreement thereby resulting in its release from the obligation to Sargon, or the tax benefit rule require[d] recovery of the tax deductions based on Hap's losses reported for 1975 and 1976." Cozzi v. Commissioner,88 T.C. 435, 445↩ (1987). 19. This language from Cozzi reaffirms hornbook law that the discharge of an indebtedness generally triggers income to the debtor. Sec. 61(a)(12); United States v. Kirby Lumber Co.,284 U.S. 1↩ (1931). 20. Nor did they testify that they had set aside assets, other than their Sagtat stock, to act as an additional source of funds to cover their outstanding notes. ↩
21. This conclusion is reinforced by our noting that these three petitioners were meticulous in their reporting other claimed interest deductions. ↩
22. Generally, the deductibility of a worthless stock is determined under section 165 of the I.R.C. of 1954, as amended. The predecessor of sec. 165↩ in the 1939 Code was found in sec. 23 and, more particularly, sec. 23(e). Additionally, Article 174 of Regulation 77, relating to the Income Tax under the Revenue Act of 1932, sets out the deductibility of a loss tied to worthless stock.
23. During these five years, Sagtat's year-end asset balance never exceeded its 1976 high of $ 432. Also, after March of 1977, Sagtat's asset accounts never reflected any additional debits. Sagtat had but one listed, tangible asset -- cash. This asset account's year-end balance went from a high of $ 320.01 at the end of 1976 to a low of $ 0 at the end of 1980. By the end of 1978, this account reflected a debit balance of only $ 5.97. In contrast to its asset accounts' paltry balances, Sagtat's liability account carried a credit balance in excess of $ 239,000 for all five years. The due dates of the liabilities reflected in this latter account were not introduced as evidence. ↩
24. No evidence was forthcoming that Sagtat and companies other than Codon had entered into contracts which could potentially produce future revenues for Sagtat. Nor was evidence produced that Sagtat was developing on its own other potentially marketable products. Thus, the data processing system represented Sagtat's only source of future revenue and value. ↩
25. At this point, we mention that we finnd it stretches credulity to the nth degree to think that Sagtat's owners and officers could rest idly in spite of Codon's failure to deliver. This is especially true when we remember that, for their undelivered system, these individuals had paid approximately a quarter-million dollars in advance to a company headed by an individual with whom they had never communicated. ↩
26. A demonstrated intention not to enforce important contractual rights has proven detrimental to a taxpayer's cause. See Cozzi v. Commissioner,88 T.C. at 446-447↩. 27. We have said, "we cannot assume that the testimony of a critical absentee witness would have been favorable * * *. Indeed, the normal inference is that it would have been unfavorable." Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); see also Tokarski v. Commissioner,87 T.C. 74, 77 (1986); Bresler v. Commissioner,65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). 28. Again we note the downside that accompanies these petitioners' failure to produce a witness. See n. 27, supra.↩
29. Items to be delivered under the Codon agreement can be found in n. 9, supra.↩
30. In fact, that evidence which these petitioners did produce in support of their view of this issue amounted to but "a tale * * * full of sound and fury, signifying nothing." Macbeth, Act V, Sc. 5, line 27. ↩
31. In fact, this treatment began at the company's formation. At that time, Sagtat's shareholders failed to execute a key agreement tied to the makeup and amount of loans each stockholder was to ultimately extend to the fledgling corporation. See n. 8, supra.↩
32. In his reply brief, petitioner Carlins argues that the burden of proof with regard to the issue just discussed should have shifted to respondent under the authority of Helvering v. Taylor,293 U.S. 507 (1935). He states that Taylor is authoritative because respondent was arbitrary in having chosen 1978 as the year of income realization. We first find ample evidence in the record to support respondent's choice of 1978 as a reasonable year for income inclusion. Second, we have said that, under Taylor, a finding that the statutory notice is arbitrary and excessive does not shift the burden of proof to the respondent. Such a finding instead shifts to the respondent the burden of going forward with the evidence. Jackson v. Commissioner,73 T.C. 394, 400-401 (1979); Cozzi v. Commissioner,88 T.C. at 443-444↩. Finally, we note that this petitioner has not properly raised this procedural issue by having presented this issue for the first time in his reply brief. See Rule 34(b)(4). 33. For Sinclair's first taxable year, running from Nov. 18, 1977 through Oct. 31, 1978, the company's stock -- $ 1.00 par value common shares -- was divided among the following shareholders in the following amounts: Shareholder
No. of Shares
Marvin Kamensky
243
Todd Kamensky
183
Robert Kamensky
182
Daniel Kamensky
182
Jonathan Landan
80
Andrew Landan
80
Henry Landan
50
For the taxable year running from Nov. 1, 1978, through Oct. 31, 1979, Sinclair's shares were divided as follows: Shareholder
No. of Shares
Marvin Kamensky
243   Todd Kamensky
183   Robert Kamensky
182   Daniel Kamensky
182   Jonathan Landan
119.25
Andrew Landan
119.25
Henry Landan
100   Sinclair's stock certificates numbered 9 and 10 evidence the acquisition of 39.25 additional shares by Jonathan Landan and Andrew Landan, respectively, in Novemberof 1978. These two certificates, however, have been altered. The certificates originally showed that Jonathan and Andrew Landan had each purchased an additional 107 shares of Sinclair stock. This 107 share amount, numerically typed in the upper right-hand corner of the certificates was later changed to 39.25. Based on Sinclair's Form 1120S covering the taxable period from Nov. 1, 1978, to Oct. 31, 1979, we find that Jonathan and Andrew Landan's stock ownership in Sinclair increased by only 39.25 shares in November of 1978. No evidence exists in the record that the stock ownership amounts of Sinclair changed in tax periods beginning after Oct. 31, 1979. During the years 1979 through 1980, Donna Barrett served as the president of Sinclair and Henry Landan served as its secretary. Over this same time period, Donna Barrett, Henry Landan and Marvin Kamensky served as the company's directors. ↩
34. Donna Barrett, a secretary at the law firm of Kamensky and Landan and the president of Sinclair, also performed service for the company. She did much of Sinclair's clerical work which included the preparing of invoices to send to the company's customers and the ordering of art from Sinclair's suppliers. ↩
35. Documents evidencing Greenwich's separate existence were not produced. ↩
36. Invoice slips sent to Greenwich were addressed to the offices of Kamensky and Landan. ↩
37. Firsel, Erens, and Rubinstein became partners in the law firm of Kamensky and Landan in 1978. Their association with the firm continued through at least 1980. Between 1978 and 1980, these three partners' share in the profits and losses of the law firm increased. ↩
38. An unexplained alteration appeared on this agreement, as introduced into evidence. In the language appearing in the above text and taken from the agreement, the word "income" had been circled and a line drawn through it. Above the word "income," an illegible word was scribbled. A second ambiguity appearing in the agreement was tied to the division of "income" interests between Firsel, Erens, and Rubinstein. In the prologue of the agreement it was stated that Firsel, Erens, and Rubinstein were to be collectively referred to as "E F & R" throughout the remainder of the agreement. For purposes of this opinion and clarity of the record, we find that the parties to the agreement wished to refer to Firsel, Erens, and Rubinstein by the acronym "F E & R." This change in the acronym properly reflects the parties' intention to distribute a greater percentage of Sinclair's income to Erens. ↩
39. On Jan. 31, 1979, Erens received $ 9,350.38; Firsel and Rubinstein each received $ 7,480.30. On Oct. 31, 1979, Erens received $ 10,759.18, and Firsel and Rubinstein each received $ 9,414.28. ↩
40. The $ 140,799 increase in sales included a $ 98,274 increase in Sinclair's accounts receivable and a $ 41,668.30 increase traceable to an account carried on Sinclair's books as an "exchange" account. ↩
41. Sinclair's tax returns for its tax years ended in 1978, 1979, and 1980 were signed by the company's president, Donna Barrett, and timely filed. ↩
42. Respondent made both concessions in his reply brief filed July 12, 1985. ↩
43. Sinclair's shareholders presented no evidence to explain the $ 856.70 difference which exists between the $ 42,525.00 increased sales figure still in dispute and the $ 41,668.30 amount in the exchange account. Noting this lack of evidence, we hold that these shareholding petitioners have conceded this $ 856.70 difference as an increase in Sinclair's sales for the company's taxable year ending on Oct. 31, 1979. CF. Welch v. Helvering,290 U.S. 111, 115↩ (1933); Rule 142(a).
44. In support of this argument, these petitioners produced five checks totalling $ 31,200 and evidencing the transfer of funds from Sinclair to Greenwich. The checks were in the amount of $ 700, $ 700, $ 14,400, $ 4,200 and $ 11,200. ↩
45. In support of his contention, respondent argues that Greenwich's failure to file tax returns necessarily leads this Court to the conclusion that Sinclair must recognize the entire amount reflected in the exchange account as its own income. ↩
46. The exchange account had a total credit balance of $ 41,668.30. These petitioners, however, attempt to trace only $ 31,200 of this $ 41,668.30 sum. Their failure to explain the $ 10,468.30 difference lends us to conclude that they have conceded this difference to be sales income belonging to Sinclair. See Welch v. Helvering,290 U.S. at 115↩; Rule 142(a). 47. In their reply brief, these petitioners mention that the customers of Greenwich paid $ 100 for each lithograph purchased. This tardily-submitted assertion appears no where else in the record of this case, and we will not consider it. See Rule 143(b). ↩
48. One example of our dual purchaser dilemma involves a buyer of lithographs named Robert Nieder. On December 21, 1978, Mr. Nieder purchased lithographs from Greenwich and also from Sinclair. Each purchase was evidenced by an invoice slip sent from Lublin Graphics, Inc. ("Lublin"). Lublin's price for the lithographs reflected on the invoice sent to Greenwich was $ 1,050; the invoice sent to Sinclair reflected a $ 500 wholesale price. On December 26, 1978, Sinclair deposited $ 10,842.50 in its account at Harris Bank. Of this total deposit, $ 6,565 was apparently received from Nieder. Having received only this information, we, however, are unable to divide the $ 6,565 received from Neider between sales attributable to Greenwich and those attributable to Sinclair. Additionally, we cannot be sure the amounts reflected on the December 26 deposit slip are indeed linked to the sales evidenced by the two December 21 invoices. ↩
49. Though the payout schedule shows that Erens, Firsel, and Rubinstein received amounts from Sinclair prior to the June 8 Agreement's signing date, this fact is of no real importance. The preambulatory language of the June 8 Agreement embodies the payouts of Sinclair's income to these three partners of Kamensky and Landan. Being in the preamble, this language embodies an underlying agreement between the members of the Kamensky and Landan firm and serves as a premise for the parties' further and subsequent understanding. ↩
50. This surmise is strengthened by our noting the report prepared by Sinclair's accountant and titled an Analysis of Profit and Loss - vs - Cash Available. In this report, amounts originally labelled as profits of Sinclair to be paid Erens, Firsel, and Rubinstein are then inexplicably labelled legal fees. This inexplicable discrepancy hardly supports these petitioning shareholders' claim that Sinclair incurred the questioned $ 53,899 professional fee. In addition, we mention the well-worn adage that "While compensation for personal services is a deductible expense, distributions of corporate earnings and profits * * * are not deductible." Trinity Quarries v. United States,679 F.2d 205, 210↩ (11th Cir. 1982). 51. Furthermore, Mr. Kamensky's testimony that the disputed fee represented expenses attributable to a time frame covering two and a half to three years prevents Sinclair, a company that kept its books according to the accrual method of accounting, from deducting the full disputed amount on its return for the single taxable year ended October 31, 1979. In making this notation, we are mindful of the admonition of sec. 1.461-1(a)(3)(i), Income Tax Regs., that "A taxpayer may not take advantage in a return for a subsequent year of his failure to claim deductions in a prior taxable year in which such deductions should have been properly taken under his method of accounting." The admonition of sec. 1.461-1(a)(3)(i), Income Tax Regs., is reinforced by the general rule of sec. 1.446-1(a)(1), Income Tax Regs., that "taxable income shall be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books." Additionally, we note that an accrual basis taxpayer may not take a deduction unless "all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii), Income Tax Regs. However, nothing in the record leads us to a conclusion that the rent and service fees making up the professional fee and attributable to taxable years of Sinclair prior to the year in question did not in fact accrue, and were therefore deductible, during these prior years. At this point, we also note that the time sheets of Messrs. Kamensky and Landan presented into evidence are of slight value in helping us to determine a proper professional fee expense for Sinclair during its taxable year that began Nov. 1, 1978, and ended Oct. 31, 1979. Instead of reflecting hours these two attorneys billed Sinclair during this particular taxable year, the time sheets reflects hours the two billed to a number of art ventures in which they were involved in a time frame prior to the taxable year in question. ↩
52. In their reply brief, Messrs. Kamensky and Landan argue that if we find that the "professional fees" claimed by Sinclair are in actuality profit distributions by the company to Erens, Firsel, and Rubinstein, we should then find that the distributions were paid in satisfaction of personal obligations of Messrs. Kamensky and Landan to these three men. Messrs. Kamensky and Landan then go on to argue that the distribution payments should trigger income to them because of this satisfaction, but that they should correspondingly get a sec. 162 deduction equal to the amount of triggered income. The issue of whether the profit distribution is in satisfaction of a personal obligation of Messrs. Kamensky and Landan was not properly raised for this first appeared in these two petitioner's reply brief. Rule 34(b)(4). Additionally, we point out sec. 262's disallowance of deductions tied to personal expenses and the failure of these two men to present facts supporting their claim that the distribution payment triggers a corresponding ordinary and necessary↩ business expense under sec. 162. 53. In its taxable year ended in calendar year 1978, Sinclair claimed $ 91,500 in "commissions" and $ 2,850 in "professional fees." In its next taxable year, the company claimed $ 140,308 in paid "commissions." ↩
54. The amounts of undistributed taxable income allocated to each shareholder in 1978 were not found on the company's filed Form 1120S for this taxable year; the amounts were instead found in the work papers of the company's accountant and on Schedule E of each shareholder's individual tax return. ↩
55. The additional income amounts received from Sinclair were written on the "other income" line -- line 20 in 1978 and line 21 in 1979 -- of each shareholder's Form 1040 tax return. ↩
56. On his 1978 tax return, Henry Landan listed $ 5,550 of commission and fee income received from Sinclair and another third party the amount of income he received from each organization was not separately stated. Nevertheless, one of Sinclair's Forms 1099-MISC for 1978 does reveal that Sinclair paid Henry Landan a $ 4,550 commission. On his 1979 tax return, Henry Landan listed a total of $ 12,449 in commission and speaking fees received from Sinclair and another third party. Once again, this total amount was not specifically divided between the two payors. The amount of $ 11,849 was gotten from Sinclair's Forms 1099-MISC for 1979. For 1979, Sinclair's Form 1099 - Misc. which evidences the payment of "commissions" to Andrew Landan states that he received $ 14,135. ↩
57. For 1978 and 1979, Henry Landan did not specifically list the amounts he received from Sinclair as additional income on his self-employment tax return. ↩
58. Henry Landan's notice of deficiency contains a clear error. The notice's Statement of Income Tax Changes for the taxable year ended Dec. 31, 1979, states that Mr. Landan's commission income from Sinclair is increased by $ 9,881. However, the explanation of this adjustment found on Schedule 7 accompanying the notice ties this $ 9,881 increase to Mr. Landan's increased share of Sinclair's undistributed taxable income for the company's taxable year ended Oct. 31, 1979. The notice's Statement schedule 9 accurately reflects the $ 28,266 increase in Mr. Landan's additional income received from Sinclair. ↩
59. Marvin Kamensky testified that this amount included a payment in full to Henry Landan and himself for the substantial services they provided Sinclair. The consequence of our accepting this testimony, he argued on brief, was that we would be forced to hold that the "commissions" paid by Sinclair to its shareholders in that same year were not in fact payments for rendered services, but were instead further payments of the company's undistributed taxable income. ↩
60. We have examined a party's actions to discern an underlying intent. Cf. Lord v. Commissioner,60 T.C. 199, 207 (1973), revd. on another issue 525 F.2d 741 (9th Cir. 1975). Additionally, courts have focused on different factors to determine the substance of a transaction. One emphasized factor is the parties' intent as gleaned from the facts and circumstances surrounding the transaction. Kansas City Southern Railway v. Commissioner,76 T.C. 1067, 1093 (1981). Cf. Garcia v. Commissioner,80 T.C. 491, 498 (1983); Laster v. Commissioner,48 T.C. 178, 189 (1967). Where an examination of the facts and circumstances reveals that the parties have acted consistently with this intent, this Court may defer to this intent. Cf. Garcia v. Commissioner,80 T.C. at 498↩. 61. Income claimed as personal service income was taxed at a maximum 50 percent rate under former sec. 1348. ↩
62. The petitioning shareholders point to a 1978 workpaper prepared by Sinclair's accountant which labelled the amounts paid by the company to its shareholders in that year as "profit distributions" and not as "commissions." This workpaper, these petitioners argue, supports their claim that the paid additional amounts are not commissions. In considering the evidentiary weight given this workpaper, however, we compare its evidentiary value to that of the actions of Sinclair and its shareholders. We also observed that "The facts must control, and bookkeeping entries are only evidence of the facts." Chatham & Phenix National Bank v. Commissioner,1 B.T.A. 460, 464↩ (1925). During 1978, Sinclair and its shareholders treated the paid amounts as commission on the many returns they filed. Also other workpapers prepared for Sinclair clearly attribute commission income to each of the company's shareholders. These actions outweigh the evidentiary value of the 1978 workpaper. 63. The reasonableness of these sums was never properly raised as an issue in this case. ↩
64. We know only that Todd Kamensky performed minor services for Sinclair. That these minor services would justify commission payments to Todd Kamensky of $ 16,653 in 1978, $ 21,681 in 1979, and $ 17,993 in 1980 is not supported by the record. We also know that the other four children performed no services for Sinclair. ↩
65. In their briefs, both respondent and petitioners mentioned former sec. 1375(c), which read as follows: Any dividend received by a shareholder from an electing small business corporation (including any amount treated as a dividend under sec. 1373(b)) may be apportioned or allocated by the Secretary between or among shareholders of such corporation who are members of such shareholder's family (as defined in sec. 704(e)(3)), if he determines that such apportionment or allocation is necessary in order to reflect the value of services rendered to the corporation by such shareholders. However, beyond mentioning this Code section, neither party persuasively argued its applicability or nonapplicability. ↩
66. These petitioners noted that when the children's commissions are included in the income of their fathers, the fathers consequently receive nearly 95 percent of Sinclair's gross profits.↩
67. The numerous factors which a court must consider in determining the reasonableness of paid compensation appear in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949); Trucks, Inc. v. United States,588 F. Supp. 638, 642-643 (D. Neb. 1984), affd. per curiam 763 F.2d 339↩ (8th Cir. 1985). 68. In deciding not to consider the reasonableness of the commission amounts attributed to Henry Landan and Marvin Kamensky, we find that these amounts reflect Sinclair's valuing of the individual services provided to it by each of these men. At this point, we also note that a recipient's reporting of service income is not inextricably linked to the payor's ability to deduct the full amount of the payment as a reasonable business expense. The fact that the payment's recipient receives an unreasonable amount of compensation does not lessen the fact that he must still fully report this received amount. Sec. 61(a)(1). ↩
69. A number of minor issues remain. These issues relate to the following adjustments: (a) Petitioners Marvin and Judith Kamensky were denied an $ 885 deduction tied to the depreciation of an automobile in 1978; (b) Petitioners Marvin and Judith Kamensky's claimed investment tax credit for 1978 was lessened by $ 37; (c) According to their notices of deficiency, petitioners Marvin and Judith Kamensky were said to have failed to report in 1978 interest income in the amount of $ 618 and dividend income in the amount of $ 1,308. At trial, the court decided that these petitioners did not receive $ 192 of the determined $ 618 of interest income or $ 1,215 of the determined $ 1,308 of dividend income. The differences, $ 426 of interest income and $ 93 of dividend income, are still in issue; (d) The petitioning shareholders of Sinclair had adjustments made to their claimed Schedule E income tied to the company. Todd Kamensky's incomes were increased by $ 168 in 1979. Daniel and Robert Kamensky's incomes were increased by $ 167 in 1979. Marvin and Judith Kamensky's income was increased by $ 222 in 1979. Henry and Joy Landan's income was increased by $ 172 in 1978; and (e) Respondent made adjustments to Henry and Joy Landan's medical expense deductions for 1978 and 1979. With regard to these adjustments, petitioners have presented no evidence in contradiction and have thus failed to carry their burden of proof. Additionally, any other issues for which petitioners have presented no evidence are deemed conceded by them. Welch v. Helvering,290 U.S. at 115↩; Rule 142(a). 70. It is of interest to note that while both men worked in the firm of Kamensky and Landan, that firm's cable address was "Taxlaw Chicago." ↩
71. An order will be issued because of the severed lithograph contribution issue in these two dockets. ↩