USCA1 Opinion

 

 August 20, 1993 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2457 JOHN S. AND LORRAINE M. FISHER, Petitioners, Appellants, v. COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee. ____________________ APPEAL FROM THE UNITED STATES TAX COURT [Hon. Lawrence Wright, U.S. Tax Court Judge] ____________________ ____________________ Before Breyer, Chief Judge, ___________ Selya and Stahl, Circuit Judges. ______________ ____________________ John S. Fisher and Lorraine M. Fisher on brief pro se. ______________ __________________ Michael L. Paup, Acting Assistant Attorney General, Gary R. _________________ ________ Allen, Ann B. Durney, and Randolph L. Hutter, Tax Division, Department _____ _____________ __________________ of Justice, on brief for appellee. ____________________ ____________________ Per Curiam. John Fisher is an employee of Digital __________ Equipment Corporation. From 1982-87 he was on a disability leave of absence from the company. In 1986, he exercised certain stock options, which resulted in a distribution to him of stock with a net value of $50,726.55. Fisher and his wife reported that sum as nontaxable long-term disability income on their 1986 tax return. The Internal Revenue Service ("IRS") disagreed and assessed a deficiency which the Fishers challenged in Tax Court. The Tax Court concluded that Digital's distribution of stock to John Fisher in 1986 was a taxable transfer of property under 26 U.S.C. ("IRC") 83 rather than tax-free income received through accident or health insurance under IRC 104(a)(3) or an accident or health plan under IRC 105(e)(1), as the Fishers claimed. It also deemed proper the assessment by the IRS of certain additions to tax against the Fishers for their failure to report the distribution as taxable income. The Fishers now appeal. Because the record shows that the Tax Court's understanding of the law and facts was correct, we affirm. I. The Characterization of the 1986 Distribution _____________________________________________ The tax provisions at issue are IRC 83, 104, and 105. Section 83(a) provides for the taxation of property transferred to a person "in connection with the performance of services." The person liable for the tax is the person who performed the services, and the amount taxed is the excess of the fair market value of the property over the amount paid for the property. A transfer of property is subject to section 83 if made "in respect of past, present, or future services." Treas. Reg. 1.83-3(f). Section 83 applies at the time a stock option is exercised where, as here, the option does not have a readily ascertainable fair market value at the time the option is granted, provided the stock is transferable or no longer subject to substantial risk of forfeiture at that time (as defined in the regulations). Id. 1.83-7(a); IRC 83(a)(1); see Treas. ___ ___ Reg. 1.83-(c) & (d).1 In general, section 104(a)(3) excludes from taxable income "amounts received through accident or health insurance for personal injuries or sickness . . . ." For section 104 purposes, amounts received under "an accident or health plan for employees" are treated as amounts received through accident or health insurance. IRC 105(e)(1). Generally speaking, an accident or health plan is "an arrangement for the payment of amounts to employees in the event of personal injuries or sickness." Treas. Reg. 1.105-5(a). ____________________ 1. Under the terms of Digital's Restricted Stock Plan, the restrictions on an employee's ability to transfer option shares were to lapse each year for a certain percentage of the shares. By the time Fisher exercised his option in 1986, all such restrictions on all of Fisher's remaining option shares had lapsed, and so the option shares at issue would have been transferable or no longer subject to substantial risk of forfeiture within the meaning of IRC 83(a)(1). -3- The pertinent facts and our assessment of them in light of this law are as follows. In 1986, John Fisher exercised his option to buy 690 shares of stock as to which the restrictions on transferability had lapsed. The fair market value of the stock was $58,132.55, and Fisher paid $7,406 to exercise his option. Fisher had been granted his stock option rights in 1976 in two stock option agreements, one of which is included in the record. The option agreement in the record makes no reference to Digital's disability plan, but explicitly states that it is subject to Digital's Restricted Stock Purchase Plan ("the Restricted Stock Plan"), and it incorporates the terms of the Restricted Stock Plan by reference. The option agreement, which was to terminate on July 28, 1986, states that Fisher could exercise the option only while "employed" by Digital. Similarly, the Restricted Stock Plan states its intent to provide incentives to certain employees "who are presently making and are expected to continue to make substantial contributions" to the company to ensure that they would "continue in the service of the Company . . ., thereby advancing [its] interests . . . ." Although the option agreement and the Restricted Stock Plan describe what Fisher's rights to exercise the option would be if Fisher retired with the company's consent, died, or terminated his employment with Digital, neither makes any reference to what Fisher's rights would be if he were unable -4- to work because of sickness or disability. Presumably, however, if he remained "employed" by Digital, his rights under the option agreement and the Restricted Stock Plan would continue, whereas if he terminated his employment because of disability, his rights would be as provided in the Restricted Stock Plan for employees whose employment with Digital terminates. As a postscript to the option agreement, Fisher signed a pledge affirming his obligations to Digital under the employment agreement he signed when he first joined Digital, and agreeing, among other things, to preserve the confidentiality of Digital's trade secrets, inform Digital of new ideas conceived by him while at Digital, and refrain from inducing others to violate their employment agreements with the company. On the basis of these documents, it is clear that Digital's grant of stock options to its employees was intended to reward present good performance and to encourage future services of like quality. Thus, transferring stock to an employee exercising an option under the option agreement would transfer property "in connection with the performance of services" as defined in the regulations. See Treas. Reg. ___ 1.83-3(f) (section 83(a) taxes property transferred "in respect of past, present, or future services"). Accordingly, such a transfer would subject the performer of the services to taxation with respect to that stock under section 83(a), and the Restricted Stock Plan states, without qualification, -5- that the option holder would receive taxable income under section 83(a) upon exercise of the option with respect to shares as to which the restrictions have lapsed. We see nothing in Digital's personnel or disability policies or in the way in which John Fisher was treated while on leave that would alter that result with respect to Digital's transfer of stock to Fisher in 1986. At the time Fisher was granted his option, he was performing services for Digital. In 1978, before he went on a leave of absence, an internal company memorandum explained that, for employees on a leave of absence, "[stock] options continue to lapse as though [the] employees were not on leaves of absence." This memorandum made explicit the inference to be drawn from the proviso in Fisher's option agreement that the option was exercisable only as long as he was "employed" by Digital -- that is, that employees on leave are still employed by Digital and have full rights under their option agreements and under the Restricted Stock Plan. Digital's leave of absence policy, stated in Section 4.23 of its "Personnel Policies and Procedures," is consistent with the 1987 memorandum. The benefits subsection of the policy describes the extent to which benefits continue for employees on a leave of absence. The entry "Qualified and Restricted Stock Plans" provides that "[i]f the employee is a participant in either the Qualified or Restricted Stock -6- Plan, restrictions on these options continue to lapse while the employee is on a leave of absence." A separate entry "Medical, Dental, Life and Disability Insurance" states that employees on a leave of absence can continue their "disability income protection" by paying their premiums in advance. Thus, Personnel Policy 4.23 makes clear that some benefits continue for employees on leave; it also treats an absent employee's rights under the Restricted Stock Plan and under a long-term disability plan separately, and does not make the exercise of stock options a component of the disability benefits provided employees on a disability leave of absence. Nor do Digital's disability policies do this. In Section 5 of its benefits booklet, Digital discusses its disability plans.2 The preface explains that Digital offers one sickness and three disability plans "to help provide you with all or a portion of your income if you are sick or disabled and unable to work." (Emphasis in original.) ___ Although Digital automatically enrolls all employees in its short-term disability plan, employees must purchase their long-term disability plan from an insurance company, as Fisher did. In the event of long-term disability, the ____________________ 2. A copy of the actual long-term disability insurance policy at issue here is not included in the record, and so we rely on the description of the policy given in Digital's benefits booklet. -7- insurance company sends "monthly checks for as long as you are totally disabled . . . ." The checks amount to two- thirds of an employee's base salary, and the amounts received are not taxed.3 Nowhere does Section 5 of the benefits booklet state that disability payments may be made by way of distribution of Digital's stock under the Restricted Stock Plan or an option agreement. Although Section 5 includes a subsection entitled "What happens to your other Digital benefits if you're disabled", that subsection does not refer to the Restricted Stock Plan or employee option agreements either.4 ____________________ 3. There is no record support for the Fishers' allegation that John Fisher's base salary included "benefits from Digital's restricted stock plan." Rather, the Restricted Stock Plan stated that it was intended to "provide a method whereby employees . . . may be offered incentives, in __ addition to those of current compensation . . ." (emphasis ___________________________________________ added). At trial, Robert Dill, Digital's Assistant Treasurer, confirmed that employees "were paid through their weekly check as well as through the benefits they got from th[e] stock option plan." This suggests that the stock option was not part of Fisher's weekly salary, although it was an additional component of his overall compensation. In any event, even if the value of the stock option had been included in Fisher's base salary, that would not have made a distribution of stock to him pursuant to his exercise of his stock option a payment under his disability insurance policy, but presumably would only have increased the amount of the monthly check issued to him by his disability insurance company. 4. Thus, while we have no doubt that Digital's long-term disability policy bears all the indicia of accident or health insurance or an accident or health plan as the Fishers argue, their contention is essentially irrelevant since the stock distribution at issue here could not have been effected pursuant to that policy. -8- John Fisher was on disability leave from Digital from 1982-87. At no point during his leave did Fisher or Digital terminate Fisher's employment with Digital. Although he performed no services for Digital during that time, he presumably continued to observe his employment agreement (reaffirmed in the option agreement), which was a matter of clear importance to Digital. In addition, Digital carried him on its employee rolls, extended certain benefits to him, and undoubtedly anticipated his performance of future services when his disability ended. (Fisher did return at the end of his leave and as of the time of trial was still performing services for Digital.) Consistent with Personnel Policy 4.23, the restrictions on Fisher's option stock continued to lapse during his leave, and before his option agreement expired in July 1986, he exercised his option to purchase the then remaining shares of stock on which restrictions had lapsed. As the facts show, that exercise could only have been pursuant to the option agreement, which was fully effective at that time since Fisher's employment with Digital had not terminated, the Restricted Stock Plan and Personnel Policy 4.23. The option could not have been exercised pursuant to his rights under the long-term disability insurance policy he had purchased. That policy provided only for the receipt of monthly checks from Fisher's disability insurance company during his disability, which -9- Fisher testified he had received and excluded from taxable income. On these facts, we have no hesitation affirming the Tax Court's decision that the distribution of stock to Fisher was taxable under section 83(a). The purpose of the Restricted Stock Plan was to encourage the continued services of certain employees by distributing stock which became more valuable to those employees as their service to the company continued. Through its leave of absence policy and the specific provisions of the option agreement, which required only that an optionee remain "employed" in order to exercise his option, Digital ensured that employees whose employment had not terminated, but who were temporarily unable to perform services because on a leave of absence, were entitled to take advantage of the benefits of the Restricted Stock Plan, thus receiving the same incentive to continue their employment as employees not on leave. The Restricted Stock Plan was not intended to provide stock to sick or disabled employees, and, being entirely silent on the subject, cannot conceivably be thought to have done so. Likewise, the disability policy made no mention of distributing stock to sick or disabled employees, but spoke only of distributing monthly checks to disabled employees, and so cannot conceivably be thought to have authorized stock distributions to disabled employees. Consequently, the Restricted Stock -10- Plan was not accident or health insurance under IRC 104 or an accident or health plan under IRC 105, nor was the 1986 distribution of stock a disability payment to Fisher under Fisher's long-term disability insurance. -11- II. Additions to Tax ________________ The IRS assessed certain additions to tax against the Fishers for failing to report Digital's distribution of stock to John Fisher as taxable income. Before its change in 1989, section 6653(a)(1), which applies to the Fishers' 1986 tax return, provided for certain additions to tax if a taxpayer's underpayment of tax was due to negligence. Section 6653(a)(3) defined negligence to include "any failure to make a reasonable attempt to comply with the provisions of this title," and case law defines it to be "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." See, e.g., Neely ________________ v. United States, 775 F.2d 1092, 1095 (9th Cir. 1985). _____________ Former section 6661(a), which applies as well, provided for an addition to tax if a taxpayer substantially understated his income tax for any taxable year, and section 6661(b)(2)(B) permitted a reduction in the addition to tax if there was "substantial authority" for the taxpayer's position or if the taxpayer "adequately disclosed" the relevant facts in his return. The taxpayer has the burden of showing that penalties under sections 6653 and 6661 should not have been assessed. Sandvall v. Commissioner, 898 F.2d 455, 459 (5th ________ ____________ Cir. 1990).5 ____________________ 5. There is no dispute that, if the stock distribution was a taxable transfer of property, the Fishers had underpaid their tax within the meaning of section 6653 and had substantially -12- John Fisher is a certified public accountant who, before joining Digital, had performed audits and worked in the tax department of a Big Eight public accounting firm for approximately eight years. Before filing their 1986 return, the Fishers had received a W-2c form showing that the 1986 stock distribution was a taxable transfer of property (the form corrected a previously received W-2 form which apparently had not included the distribution). During his leave, John Fisher had received monthly disability checks from his disability insurer which (with the exception of one year apparently) he had excluded from income on his tax returns. Nevertheless, on their tax return the Fishers described the stock distribution as "L.T. disability income from 100 percent employee funded stock option excluded under section 104(a)(3)." Appropriately emphasizing Fisher's particular expertise as an accountant with tax and auditing experience, see Carlins v. Commissioner, 55 T.C.M. 228, 244- ___________ ____________ 45 (1988) (memorandum decision), the Tax Court found the Fishers negligent in not reporting the stock distribution as taxable income. It also found that the Fishers had no substantial authority for their position and did not make adequate disclosure on their 1986 return. In view of what we have said above, we have no doubt that the Tax Court was right. The Fishers had no ____________________ understated their tax within the meaning of section 6661. -13- factual basis for describing the stock distribution as being a payment under John Fisher's disability insurance. The record shows plainly that Fisher's right to exercise his stock option was based on the option agreement, the Restricted Stock Plan and Personnel Policy 4.23, and not on his long-term disability insurance. Thus, their statement that the distribution was "L.T. disability income" was inaccurate and misleading.6 To sufficiently apprise the IRS of "the nature of the potential controversy" regarding their tax treatment of the stock distribution so as to make adequate disclosure, see Treas. Reg. 1.6661-4(b)(1)(iv), at ___ a minimum the Fishers needed to refer to the existence of the _________ option agreement, the Restricted Stock Plan, Personnel Policy 4.23 and John Fisher's long-term disability insurance. Cf. ___ id. (b)(4) ("Disclosure is not adequate . . . if it consists ___ ____________________ 6. We see no need to discuss the arguments the Fishers make to support their characterization of the distribution as being a "100 percent employee funded stock option excluded under section 104(a)(3)" pursuant to the allocation rules in regulations enacted under section 105. Because the distribution in question cannot conceivably be regarded as a payment pursuant to accident or health insurance or an accident or health plan, further discussion of the Fishers' arguments regarding the amount and timing of Digital's contribution to the stock option plan as an accident or health plan is pointless. -14- of undifferentiated information . . . .").7 They did not do so. Nor did they have substantial authority for their position that the stock distribution was not taxable. They say that they relied on BNA Portfolio #389 and certain case law in treating the distribution as nontaxable income under section 104(a)(3). The statement they relied on is as follows: For purposes of 104(a)(3), insurance benefits include amounts received from a non-insured fund. 31/ Accident or health benefits from a qualified __ pension, profit-sharing, or stock bonus plan are also within the scope of 104(a)(3). 32/ __ Even if inactive in 1986, as an accountant with tax experience John Fisher must have known that he could not rely on so general a statement as this in asserting that the distribution here was exempt from taxation under section 104(a)(3). Moreover, Footnote 32, which the Fishers highlight in the appendix to their appellate brief, referred the reader to a different portion of the portfolio for an assessment of when the plan in question was "qualified" under ____________________ 7. The regulation referred to contains requirements for disclosures made in a statement attached to the return. The Fishers did not attach a statement to their return, but noted the tax position they took directly on the return. Nevertheless, in their brief they claim that they met all the requirements of this regulation, and so we use it as a measure of the adequacy of their disclosure. Judged by common sense standards as well, however, their disclosure was unquestionably inadequate given the disparity between the claim they were asserting and the actual facts. -15- section 104(a)(3). The Fishers did not provide that portion of the portfolio to the Tax Court, and do not state that the information it contained substantiated their position. Moreover, Footnote 32 also referred the reader to the second sentence of section 104(a), which concerns the treatment of payments to self-employed individuals and so is not applicable, and to Trappey v. Commissioner, 34 T.C. 407 _______ ____________ (1960). Trappey and the other cases cited by the Fishers are _______ all readily distinguishable since all involved payments made pursuant to contractual or statutory provisions which expressly authorized the payments to certain employees in view of their disability. The stock distribution here was made pursuant to the option agreement, the Restricted Stock Plan and Personnel Policy 4.23, none of which expressly provided for the distribution of stock to sick or disabled employees. Because they are factually distinguishable, none of the cases which the Fishers relied on in preparing their return is substantial authority for the tax position they took. See Treas. Reg. 1.6661-3(b)(1) ("There is ___ substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial . . . ."); id. (b)(3) ("[T]he weight of ___ authorities depends on their persuasiveness and relevance . . . . For example, a case . . . would not be considered -16- particularly relevant if the authority is materially distinguishable on its facts . . . ."). Nor would any reliance by the Fishers on any statements by Digital employees suggesting that the distribution was tax-free under section 104(a)(3) have been reasonable: the Restricted Stock Plan itself stated unqualifiedly that exercising the stock option with respect to transferable option shares would result in a taxable transfer of property under section 83; the relevant documents demonstrate that no connection whatever existed between the option agreement and Restricted Stock Plan, on the one hand, and John Fisher's disability or long-term disability insurance, on the other; Digital had issued a W-2c form to Fisher stating that the distribution was taxable income before the Fishers filed their return; and John Fisher had been receiving and deducting monthly checks from a disability insurer on account of his disability consistent with the terms of his disability policy. Moreover, any such statements would not have been substantial authority under section 6661, even if the employees in question had been tax professionals. See Treas. Reg. 1.6661-3(b)(2) ("legal ___ opinions or opinions rendered by other tax professionals . . . are not authority"). The judgment of the Tax Court is affirmed. -17-